IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03281-MEH-CBS

KALTHUN OSMAN,

      Plaintiff,

v.

BIMBO BAKERIES USA, INC.,

      Defendant.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Before the Court is Defendant's Motion for Summary Judgment ("Motion") [filed November 4, 2015; docket #30].   The Motion is fully briefed, and the Court finds that oral argument will not assist in its adjudication of the Motion.   Based on the record herein and for the reasons that follow, the Motion is **granted in part** and **denied in part**.[1]

## BACKGROUND

### I.    Procedural History

      Kalthun Osman ("Plaintiff") initiated this action on December 3, 2014.   Docket #1. Plaintiff's claims, as detailed in the operative Amended Complaint filed December 5, 2014, arise from her employment at Bimbo Bakeries, USA, Inc. ("Defendant"), where she alleges she

---

[1]Pursuant to 28 U.S.C. § 636(c) and the Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges, the parties consented to the jurisdiction of this Court to conduct all proceedings in this civil action.   Docket #12.

encountered unlawful employment practices in violation of Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq.* ("Title VII").  Docket #8 at 1.  She alleges her supervisors created a hostile work environment and discriminated against her on the basis of her national origin, race, color, and sex, and retaliated against her after she made a formal complaint about the violations.  *See id.*  The operative pleading asserts three claims for relief: (1) hostile work environment and Title VII discrimination based on national origin, race, and color; (2) hostile work environment and Title VII discrimination based on sex; and (3) Title VII retaliation.  She requests the following relief: (1) injunctive relief, including reinstatement; (2) back pay, benefits, pension, and seniority; (3) front pay as applicable; (4) compensatory and punitive damages as provided by law; (5) prejudgment and post judgment interest; and (6) costs and reasonable attorney's fees, including expert witness fees.

Defendant filed the current Motion on November 4, 2015 [*see* docket #30], arguing (1)  the hostile work environment claims must be dismissed because Plaintiff fails to present evidence that any alleged harassment she suffered was motivated by discriminatory animus; (2) the retaliation claim must be dismissed because the retaliatory acts Plaintiff alleges are not actionable; and (3) the remedy of back pay is not available to Plaintiff because she was not constructively discharged.  *See generally* docket #30.  Plaintiff filed her Response on December 9, 2015 [*see* docket #33], and Defendant replied on December 31, 2015 [*see* docket #37].

## II.    Findings of Fact

The Court makes the following findings of fact viewed in the light most favorable to Plaintiff, who is the non-moving party in this matter.

1.      Plaintiff is an African-American[2] female, and of Somalian national origin.[3]   Docket #30, exh. 1, Deposition of Kalthun Osman ("Plaintiff Dep.") at 5:6-13.

2.      Defendant is a manufacturer of fresh-baked, brand-name bread products including products sold under the brands Oroweat, Thomas' and Sara Lee, which are baked at Defendant's bakery in Denver, Colorado.  *Id*. at 15:9-17.

3.      Approximately 100 employees work at the Denver bakery.  Docket #30, exh. 2, deposition of Plaintiff's supervisor, Kenneth Brown ("Brown Dep.") at 8:2-4.  Approximately 6-8 of the 100 employees are women.  Plaintiff Dep. at 32:5-12.  About six of the employees are foreign born.  *Id*. at 32:13-22.

4.      Plaintiff first began working at the Denver bakery in 2004 and held the position of a "jobber."  *Id*. at 23:13-17.

5.      Many bakery employees, including Plaintiff, are members of the Bakery, Confectionery, Tobacco, and Grain Millers Union ("Union").  *Id*. at 16:14-19.

6.      Kenneth Brown was production manager at Defendant's Denver bakery from 2007 through September 2013, and during that time was Plaintiff's second-level supervisor, meaning Plaintiff reported first to a shift supervisor and then to Brown.  Brown Dep. 13:18-14:23, 19:23-20:2.

---

[2]Plaintiff does not indicate that she has become a citizen of the United States, but her Amended Complaint lists her as "African-American."  Docket #8 at 1.

[3]Defendant's Motion contains many pages of facts alleging Plaintiff had "an extremely traumatic childhood and early adulthood," has "a long history of medical issues, including depression," has "mistrust issues," and "projects a lifetime's worth of emotional trauma upon her former supervisor."  *See generally* docket #30 at 1-5.  Plaintiff asserts these and other similar facts only apply to damages and are thus inapplicable to the present Motion.  Docket #33 at 1-2.  The Court agrees with Plaintiff, and at most these facts might go to issues such as credibility and motive but are not appropriate fodder for summary judgment.  Thus, the Court in the present Motion disregards Defendant's assertions of Plaintiff's pre-existing status.

7.      Ron Schulthies, plant manager at Defendant's Denver bakery, was Brown's supervisor during this same time period.  *Id*. at 7:10-11, 19:23-20:10.

8.      When Defendant posts a job category, employees may "bid" on the job – putting themselves in consideration for the position, which is to be determined in part by seniority.  *Id*. at 24:18-25.

9.      In 2006, Plaintiff bid to move from the "jobber" role to a "vacation relief associate" position, which Defendant granted.  Plaintiff Dep. at 23:13-17.  In her new capacity, she replaced workers and performed their jobs while they were on vacation.  *Id*. at 20:16-21:1.  Plaintiff wanted that job because she aspired to be a foreman and then a supervisor someday, so she wanted to be familiar with many positions.  *Id*. at 23:18-24:7.

10.     Those employees working in vacation relief positions must be versatile to be able to fill in for a variety of positions at the bakery.  *Id*. at 21:2-11.  However, not all vacation relief associates are qualified to work positions that involve the oven and the mixing jobs.  *Id*. at 202:19-22.  Vacation relief associates work week-long shifts, but they may be asked to help in other positions mid-week, which they are allowed to decline.  *Id*. at 21:14-23:3.

11.     Later, Plaintiff bid for foreman jobs, but she was never interviewed for one.  *Id*. at 24:1-4.

12.     Kimberly Hert, who was Union shop steward at the bakery in 2008 and 2009, met with Brown to discuss how Brown "often refused to let [Plaintiff] bump other employees, even though [Plaintiff] was entitled to do so under the collective bargaining agreement" and "refused to train her, despite [Hert's] requests that he do so, when she got the vacation relief job."  Kimberly Hert Affidavit ("Hert Aff."), docket #33-4  at 2.

13.     Brown does not recall a meeting with Hert regarding Plaintiff's training.  Brown Dep. at 63:5-8.

14.     Plaintiff began having issues with Brown, her second-level supervisor.  Plaintiff Dep. at 52:8-21.  Brown frequently yelled and cursed at her, leading Plaintiff to verbally report the alleged mistreatment to Schulthies, Brown's supervisor, many times.  *Id*.  Plaintiff says she did not report the mistreatment in writing to human resources until 2012 (as explained below) because she was scared she would lose her job, but she told "Schulthies, not once, not 10 times, maybe over like 50 times" that she had been "discriminated against" and "harassed."  *Id*.

15.     Employee Amina Wako, who worked at the bakery from 2000 until November 2014, bid on a job that she had seniority to receive, but Brown wanted to give the job to a male employee instead.  Amina Wako Declaration ("Wako Dec."), docket #33-6 at 2.  When she objected to this with Brown, Brown tried to "intimidate" her.  *Id*.  When Wako elevated this to the Union, she received the position.  *Id*.  Wako saw Brown yell at female employees, but not at male employees.  *Id*.

16.     Brown denies yelling or cursing at Wako.  Brown Dep. at 46:23-25.

17.     Employee Vera Borulko has been employed at Defendant's bakery "a number of years," including "during the time that [Plaintiff] has been employed there."  Vera Borulko Affidavit ("Borulko Aff."), docket #33-7 at 1.  Borulko had difficulties with her foreman, and when the problems were taken to Brown for resolution, "he yelled at me, treated me with disrespect, and did not listen to what I was saying."  *Id*.  Brown "made it clear he would never help me with regard to any work-related issues."  *Id*.  Borulko reported "many of these incidents" to Roxine Nixon, the Union steward during that time.  *Id*. at 2.  Borulko saw Brown yelling at female employees, but not male.  *Id*. at 1.  Borulko said Brown yelled at foreign-born women "very frequently, usually on a daily basis."  *Id*. at 1-2.

18.     However, in a statement provided by Defendant regarding its Motion, signed 19 days before

the Borulko Aff., above, Borulko (currently an employee of Defendant), said that Brown has "never yelled or cursed" at her.  Vira[4] Borulko Declaration ("Borulko Dec."), docket #37-8 at 1.

19.     Brown denies yelling or cursing at Borulko.  Brown Dep. at 46:19-22.

20.     Some of Defendant's employees have not experienced discrimination by Brown or been cursed at by him, nor have they seen him do these things to other employees.  *See, e.g.*, Declaration of Donald Garcia, docket #37-1; Declaration of Rick Vigil, docket #37-3; Declaration of Adela Orozco, (born in Mexico) docket #37-5; Declaration of Luisa Hernandez (born in El Salvador), docket #37-6; Declaration of Anabel Cardenas (a woman born in Mexico who has seen Brown yell, but equally at men and women), docket #37-7.

21.     Hert, the Union steward in 2008 and 2009, "frequently" witnessed Brown yelling at Plaintiff, characterizing it as Brown "getting in her face for no reason."  Hert Aff. at 1, 5.  Hert also noted Brown "yelled at other female employees as well" with an "aggressive and abusive attitude and demeanor toward female employees that was not evident in his interactions with male employees. He was always very short and rude with the women who worked in the [b]akery."  *Id*. at 1.  Hert also indicated Brown had issues with foreign-born women and was "frequently in disputes with these employees."  *Id*. at 2.

22.      Fellow employee Henry Mitchell "often over the years since at least 2008, and at least through 2013" saw and heard Brown "yelling at [Plaintiff] in a very abusive manner" about "once a week to about once every other week over those years."  Henry Mitchell Affidavit ("Mitchell Aff."), docket #33-5 at 1.  Mitchell said Brown yelled at other foreign-born women as well during

---

[4]The parties differ in their spelling of this name.  Plaintiff uses Vera Borulko [*see* Borulko Aff., docket #33-7 at 1]; Defendant uses Vira Borulko [*see* Borulko Dec., docket #37-8 at 1].

the same time period.  *Id.*

23.     However, in a statement provided by Defendant regarding its Motion, signed 15 days before

the Mitchell Aff., above, Mitchell (currently an employee of Defendant) reported that he has seen

"Brown yell at employees, but this has included both men and women," and that he has "never heard

what Ken Brown and/or the employees were discussing during these incidents."  Henry Mitchell

Declaration ("Mitchell Dec."), Docket #37, exh. 2 at 1-2.

24.     In 2008, Brown and Plaintiff had an altercation when she refused to do a job Brown had

asked her to perform.  Plaintiff Dep. at 83:10-84:3.

25.     The altercation began because Plaintiff believed Brown was ignoring her seniority by pulling

her off her schedule in the middle of the week to fill in on a more difficult job while giving another

employee an easy job.  *Id.* at 77:4-12.  She said she would not make the switch, which resulted in

Brown yelling, cursing, and throwing a "bump cap" – a hat worn by employees in the bakery – at

Plaintiff, saying "I'm tired of your fucking attitude."   Plaintiff Dep. at 69:14-23; 77:8-16; Brown

Dep. at 57:6-11.

26.     The bump cap incident, which happened in a windowed office near the production floor, was

witnessed through the glass window by many employees.  Plaintiff Dep. at 77:8-24; Mitchell Aff.

[produced by Plaintiff] at 2 (indicating it appeared to him to be "an intentional act"); Mitchell Dec.

[produced by Defendant] at 2 (indicating he saw Brown throw his bump cap and saw the cap hit

Plaintiff, but he does "not recall the path the bump cap took before hitting [Plaintiff] and does not

know if it was intentional").

27.     Brown denies throwing the bump cap at Plaintiff, instead saying he may have "slammed it

down on the table hard," causing it to bounce "off the table, hit the floor, and hit [Plaintiff's] leg."

Brown Dep. at 24:22-25; 56:8-14. Brown also denies Mitchell would have physically been in a position to see the event, nor that the event occurred as Mitchell described, perhaps because Mitchell has a motive to misrepresent because he and Plaintiff "are very close friends." *Id.* at 59:13-61:17.

28.     Immediately after the bump cap incident, Plaintiff used the bakery's intercom to summon the shop steward, Hert, who arrived at the production office and then called Schulthies, the plant manager. Plaintiff Dep. at 78:3-6. As he entered the office, Schulthies said, "I know it was an accident. . . . It's okay. He didn't mean nothing [*sic*] by it." *Id.* at 78:7-15. Mike Fushimi [vice president of the Union, *see* docket #8 at 6],[5] later called Plaintiff, told her he had talked with Schulthies, and determined it was an accident. *Id.* at 93:11-15.

29.     Brown admitted to Hert that he threw the bump cap at Plaintiff. Hert Aff. at 2. Hert also wrote a statement contemporaneous to the incident, which states the same. *Id.* at 4-9.[6]

30.     Brown denies he admitted to Hert that he threw the bump cap at Plaintiff. Brown Dep. at 63:9-64:5.

31.     Plaintiff did not file a grievance at the time of the bump cap incident, because she was afraid of losing her job. Plaintiff Dep. at 93:23-94:2.

32.     In 2009, Plaintiff had a conversation with Brown to ask to "bump" another employee, a procedure whereby more senior employees may displace less senior employees to gain experience

---

[5]No specific evidence provided to the Court indicates the title of Fushimi, but the Amended Complaint names him as vice president of the Union.

[6]Defendant argues the contemporaneously written statements are inadmissible hearsay and should not be considered. Without concurring or disagreeing, the Court has disregarded any statement that does not have an associated sworn statement affirming its authenticity. In the case of Hert, she indicated in her sworn affidavit that the contemporaneously written statement, attached to her affidavit, "remains true and accurate," thus the Court considers the information in the handwritten statement as well as the affidavit. The Court has done the same regarding other references within these facts to contemporaneously written statements.

working in a different position for a period of time.  *Id*. at 95:7-96:16.  Brown told her he was tired of her coming into the production office every week trying to bump somebody.  *Id*. at 96:17-25. Plaintiff responded that the problem would not occur if Brown would schedule based on seniority. *Id*. at 97:1-3.  As Plaintiff began to walk out the door, Brown called her "a little bitch."  *Id*. at 97:5-6.  Hert, the shop steward, was in the office when that occurred.   *Id*. at 97:8-12.

33.     Brown does not recall that he ever called Plaintiff that.  Brown Dep. at 65:12-16.

34.     Plaintiff wrote a letter to Schulthies telling him about the incident and how she feels Brown "degrades [her] as a woman."  *Id*. at 97:19-98:4.

35.     As soon as he received the letter, Schulthies called Plaintiff into his production office and told her he was "going to take care of it."  *Id*. at 98:4-8.

36.     Defendant appears to assert this letter does not exist, noting in its Motion, "[Plaintiff] claims that she gave a letter to Schulthies complaining of Brown's mistreatment, but has no copy of this letter."  Docket #30 at 7; *see also* Plaintiff Dep. at 99:25-100:23 (where counsel asked questions about the existence of the letter because Plaintiff does not have a copy of it).

37.     At the time Plaintiff wrote the letter to Schulthies, Nixon, who served as Union steward for the Denver bakery from approximately 2009 to 2013, talked with Plaintiff about the letter.  Roxine Nixon Affidavit ("Nixon Aff."), docket #33-3 at 3.  At a later meeting, Schulthies admitted receiving the letter.[7]  *Id*.

38.     Mitchell, a fellow employee, helped Plaintiff write the letter.  Plaintiff Dep. at 100:7-8.

39.     Plaintiff and Schulthies met after his receipt of the letter, at which time Schulthies said he

---

[7]Nixon refers to this meeting date as being held on July 27, 2012; however, it is not clear from materials provided to the Court if the alleged admission by Schulthies regarding receipt of the letter occurred at that meeting or another on a later date.  Regardless of whether an additional meeting occurred, the finding of fact goes to Defendant's admission of receiving the letter.

would "make sure it never happens again." *Id*. at 101:8-102:7 (extraneous idioms omitted).

40.     Shortly after that meeting, Plaintiff said Brown approached her and said, "You just went to [Schulthies] to bitch about me and complain about me?" *Id*. at 98:9-12.

41.     Brown denies being told before 2012 that there were any complaints made by Plaintiff about him yelling, cursing, or treating her in an abusive manner.  Brown Dep. at 53:2-6; 70:16-18

42.     Soon after this incident, Plaintiff said she "got too stressed out and took [a] leave of absence," reporting to her doctor that she was "so depressed" she "can't do this job," but then telling the doctor it was "not work related" because she was "so scared."  Plaintiff Dep. at 98:12-16.

43.     When she took leave for depression in 2009, she did so under the Family Medical Leave Act ("FMLA"), the need for which Plaintiff now blames on the hostile work environment created by Brown.  *Id*. at 106:25-110:11.  She says she misrepresented her position to her doctor because she was told the doctor had to send an FMLA form to the bakery, and she "didn't want to lose [her] job." *Id*. at 108:3-13.

44.     The doctor's note from the appointment that instigated the leave says Plaintiff was "[c]oping with emotional stressors (including ill father).  May need time off to address these issues."  Docket #30, exh. 6 at 1.

45.     Plaintiff returned to work in August 2009 after her FMLA leave.  Plaintiff Dep. at 111:17-20.

46.     Nixon, the Union steward, saw Brown yelling at Plaintiff approximately once a week.  Nixon Aff. at 1.

47.     Nixon saw Brown yell at other women – but not men – at the bakery from 2009 to 2013. *Id*.

48.     Nixon also noticed that Brown assigned heavy work, such as the mixer and bread loader, to

Plaintiff even when Plaintiff was pregnant.  *Id*. at 2.

49.     Plaintiff was on maternity leave from November 2010 through September 2011 with her first pregnancy.   *Id*. at 111:21-112:4.  She received short-term disability during her maternity leave. Docket #30, exh. 8, at 6-7.

50.      Plaintiff returned to work for a short time in late 2011 and then was laid off from December 2011 through March 2012.  *Id*. at 131:24-133:1.  She received unemployment compensation during her layoff.  Docket #30, exh. 8, at 6-7.

51.     Plaintiff was recalled from layoff March 31, 2012.  Plaintiff Dep. at 124:12-19.

52.     During an altercation on June 6, 2012, when Plaintiff was dismissive to Brown early in the morning, Brown pushed Plaintiff from the back and told her, "Go do your fucking job."  Plaintiff Dep. at 125:2-126:23.  Plaintiff told him, "Don't effing touch me.  You're not my effing father. You're not going to put your hands on me.  I'm not your wife.  Don't ever touch me again."  *Id*. at 126:2-4.

53.     Brown then called Plaintiff into a nearby office where the altercation continued with him telling her he would fire her or put her on "the call list." *Id*. at 126:5-12.  When Plaintiff told Brown she would report the incident, he said, "It's your word against my word."  *Id*. at 126:23-24.

54.     Brown indicates he did not intentionally push Plaintiff and that it was an accident.  Brown Dep. at 35:3-13.  Brown says he did not threaten to put Plaintiff on the on-call list, and he says he does not have the authority to put people on that list.  *Id*. at 47:13-48:1.

55.     Plaintiff says Brown again pushed her on July 11, 2012, in a confined space called a "divider," where he "elbowed [her] without saying excuse me, sorry, or anything."  *Id*. at 133:8-134:9.

56.     Brown denies pushing Plaintiff on July 11, 2012, saying he "possibly bump[ed] [Plaintiff]" while reaching into a machine in a confined area to prevent a production shutdown.  Brown Dep. at 35:21-36:8.

57.     Nixon, the Union steward, reported in two contemporaneously written statements that she, Brown, Schulthies, and Plaintiff had a meeting on July 27, 2012.  Nixon. Aff. at 4.  In recounting previous events, Plaintiff mentioned a letter she had previously written to Schulthies about Brown's actions against her, which Schulthies acknowledged he remembered receiving.  *Id*.  Schulthies explained to Plaintiff that Brown "only acts that way because he is under a lot of stress," but that Brown "will do better in the future."  *Id*. at 5-6.  Plaintiff asked Brown why he treats her the way he does; Brown replied "that she does do her job, and she does it well."  *Id*. at 5.  Brown told Plaintiff he would "work on himself."  *Id*. at 6.  After the meeting, Plaintiff told Nixon she wanted to file a grievance.  *Id*. at 6.

58.     Brown does not "specifically recall" anyone saying at that meeting that he would "do better in the future."  Brown Dep. at 77:18-20.  He does remember telling Plaintiff he would work on himself, but he was "referring mainly to the swearing on the floor."  *Id*. at 77:21-25.

59.     On August 1, 2012, Plaintiff filed a Union grievance relating to Brown's mistreatment of her. Docket #30, exh. 9.  Schulthies denied the grievance.  *Id*.  This grievance included Plaintiff reporting the bump cap incident, but the grievance did not mention discrimination.  *Id*.

60.     In response to the August 1, 2012 grievance, Ronald Bryan, Defendant's human relations manager, wrote a letter to the Union dated September 20, 2012, saying: "[I]t is the philosophy of the Company that all associates are treated with respect and dignity.  Using profanity and touching associates is unacceptable under any circumstances.  The Company will review our beliefs and

policies with Ken Brown to assure he fully understands and manages in accordance with these principles." Docket #30, exh. 14.

61.     Bryan conveyed that information to Brown at a meeting on September 17, 2012, regarding Plaintiff's grievance. Brown Dep. at 37:17-40:4. The meeting was attended by Bryan, Brown, Schulthies, Plaintiff, Dan Severt, and "possibly Mike Fushimi." *Id.* at 39:19-21.

62.     Brown was suspended for three days after this meeting. Brown Dep. at 83:4-16; *see also* docket #30 at 10.

63.     Plaintiff filed a Charge of Discrimination with the EEOC on October 19, 2012, which she then amended on April 29, 2013. Docket #30, exh. 15; *see also* docket #8 at 2. She indicated she had been discriminated against because of her sex and national origin, and in retaliation "for having opposed a discriminatory practice in violation of Title VII []." *Id.* at 1. She specifically noted that since about 2007 until the date of the charge, she had been "subjected to a hostile work environment by [her] supervisor, Ken Brown, which consists of being yelled at; being cursed at; being bumped and shoved; being threatened with discharge; and being subjected to unequal terms and conditions of employment." *Id.* She also wrote: "After the company was notified that [she] was filing a charge with the EEOC, [she] was put on training for the oven," which had never occurred in the eight years in which she had covered vacation relief. *Id.* at 2. She considered the assignment to be retaliatory. *Id.* Finally, she noted that "[o]ther females from different countries are also yelled at and cursed at and treated poorly by Ken Brown." *Id.*

64.     Defendant asserts Plaintiff wanted to be trained on the oven as she had previously complained about not being trained on all jobs. Docket #30 at 11; *see also* Brown Dep. at 52:17-23.

65.     Another foreign-born, female employee, Anabel Cardenas, stated that she worked on the

oven and it was never as a punishment.  Declaration of Anabel Cardenas, docket #37-7 at 2.

66.     Sometime in 2013, Brown became plant manager at another of Defendant's bakery facilities.

Plaintiff Dep. at 173:14-16.  Thereafter, Plaintiff then began having issues with supervisors Ron

Weeks and Joe Urban.  *Id*. at 174:3-12.

67.     Plaintiff filed a second Charge of Discrimination with the EEOC on or about January 15,

2014, indicating that she had been retaliated against for filing the first charge.  Docket #30, exh. 4.

She wrote, "Since filing my initial charge of discrimination, I have been subjected to retaliation by

various members of management at Bimbo.  On numerous occasions, I was asked why I filed the

charge.  When I have attempted to discuss my claims, management responded, 'Why can't you just

let it go.'"  *Id*. at 2.  She also wrote that one manager told her, "I am watching you."  *Id*.

Additionally, she asserted that in retaliation for her filing the charge, she has been: assigned to

physically demanding positions; placed on premature medical leave related to her [second]

pregnancy; assigned to undesirable shifts and positions, contrary to the Union agreement; and

improperly transferred to a different position, also contrary to the Union agreement.  *Id*.

68.     Plaintiff continues to work at the Denver bakery two days a week.  Plaintiff Dep. at 260:22-

24; 262:24-263:1; 263:22-25.

## LEGAL STANDARD

A motion for summary judgment serves the purpose of testing whether a trial is required.

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant

summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits

show there is no genuine issue of material fact, and the moving party is entitled to judgment as a

matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit

under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the

evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). To avoid summary judgment, the plaintiff must "present sufficient evidence in specific, factual form" to show a "genuine issue of material fact." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

### I.   Hostile Work Environment

Defendant argues Plaintiff's first two claims regarding hostile work environment should be dismissed, because Plaintiff: (1) cannot show any harassment she suffered was motivated by discriminatory animus; (2) admitted in her deposition that Defendant did not discriminate against all women but merely foreign-born women; and (3) did not face discrimination that was severe or pervasive enough to meet the legal standard. *See generally* docket #30. Plaintiff responds that Defendant treated Plaintiff disparately because she belonged to two or more protected classes, thus her two hostile work environment claims should survive, and the facts show such treatment was pervasive and severe. *See generally*, docket #33.

A plaintiff must show evidence supporting both elements of a hostile-work environment claim: (1) she was discriminated against because of a protected ground; and (2) the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment. *Morris v. City of Colo. Springs*, 666 F.3d 654, 663 (10th Cir. 2012). Evidence of the second prong must "show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Serv.*, 142 F.3d 1334, 1341 (10th Cir. 1993) (quotation omitted).

 "Whether an environment is hostile or abusive can be determined only by looking at all the circumstances including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotation omitted).  Courts also must evaluate whether plaintiff was "subjected to this abusive environment because of this protected characteristic." *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  A plaintiff must show that the environment was both objectively and subjectively hostile or abusive. *Morris*, 666 F.3d at 663-64.

### A.    Hostile Work Environment on the Basis of National Origin, Race, and Color

The Tenth Circuit has held that to establish a racially hostile work environment:

> [P]laintiffs must prove more than a few isolated incidents of racial enmity.  Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute.  Instead, there must be a steady barrage of opprobrious racial comment.  Title VII is violated only where the work environment is so heavily polluted with discrimination as to destroy the emotional and psychological stability of the minority [employee].

*Hicks v. Gates Rubber Co.*, 933 F.2d 1406, 1412 (10th Cir. 1987).  A plaintiff must do more than show she worked in a stressful environment riddled with personality conflicts:

> The hostile work environment that [the plaintiff] portrays is simply a work environment that exhibits the monitoring and job stress typical of life in the real world.  Normal job stress does not constitute a hostile or abusive work environment.  As the Seventh Circuit explained, federal law "does not guarantee a utopian workplace, or even a pleasant one. . . . [P]ersonality conflicts between employees are not the business of the federal courts." We cannot vilify every supervisor that implements a policy with which an employee disagrees or that monitors her employees' conduct.  Plaintiff has not cited any cases that have found similar

employer conduct to constitute a racially hostile work environment, and we decline to extend the contours of a "hostile work environment" to include Plaintiff's alleged job situation.

*Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1214 (10th Cir. 1998) (internal citations omitted). A plaintiff must prove that she suffered harassment motivated by discriminatory animus. *See, e.g.*, *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).

Here, the Court agrees with Defendant that Plaintiff fails to show discriminatory animus in regard to her national origin, race, or color. Nowhere in all of the materials submitted to the Court does Plaintiff show that any of the statements made or actions taken against her by Defendant generally or Brown specifically have any connection to treatment based on national origin, race, or color. Not only does Plaintiff not show the requisite "steady barrage of opprobrious racial comment," she shows *none*. Therefore, the Court dismisses Plaintiff's first claim for relief: hostile work environment and discrimination on the basis of national origin, race, and color.

### B.      Hostile Work Environment on the Basis of Sex

The Supreme Court has held in the context of a hostile work environment claim based on the protected class of sex, a plaintiff has three ways to show the causal link between the alleged harassment and the protected ground: (1) explicit or implicit proposals of sexual activity motivated by sexual desires; (2) harassment motivated by general hostility toward members of one gender in the workplace; or (3) comparative evidence about a supervisor's treatment of members of each sex in a mixed-sex workplace. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998). "[N]ot all harassment creates a hostile work environment," and to survive summary judgment, a plaintiff must show that the harassment was "*because of the gender.*" *Chavez v. New Mexico*, 397 F.3d 826, 832-33 (10th Cir. 2005) (emphasis in original).

18

However, not all women in a workplace must face the same discrimination in order for a plaintiff to prove sex discrimination. Courts have found as actionable discrimination against some women but not all women based on their gender "plus" another characteristic such as appearance, pregnancy, marital status, or age. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 118 (2d Cir. 2004) (explaining that "sex plus" or "gender plus" is a judicial convenience developed in the context of Title VII to affirm that plaintiffs can, under certain circumstances, survive summary judgment even when not all members of a disfavored class are discriminated against, for example gender plus a person's physical appearance); *see also Bryant v. Int'l Schs. Servs.,* 675 F.2d 562, 573 n. 18 (3d Cir.1982); *Stroud v. Delta Air Lines, Inc.,* 544 F.2d 892, 893 (5th Cir.1977); *Sprogis v. United Air Lines, Inc.,* 444 F.2d 1194, 1197-98 (7th Cir.1971). As the judge that coined the term "sex plus" pointed out:

> Free to add non-sex factors, the rankest sort of discrimination against women can be worked by employers. This could include, for example, all sorts of physical characteristics, such as minimum weight (175 lbs.), minimum shoulder width, minimum biceps measurement, minimum lifting capacity (100 lbs.), and the like. Others could include minimum educational requirements (minimum high school, junior college), intelligence tests, aptitude tests, etc.

*Phillips v. Martin Marietta Corp.*, 416 F.2d 1257, 1260 (5th Cir.1969) (Brown, C.J., dissenting from denial of rehearing en banc). The Tenth Circuit expounded on *Phillips* (ultimately heard by the Supreme Court), recognizing "gender-plus" claims:

> In *Phillips v. Martin Marietta Corp.,* 400 U.S. 542, 91 S.Ct. 496, 27 L.Ed.2d 613 (1971) (per curiam), the plaintiff's claim of gender discrimination was based on the fact that the employer refused to accept applications from women with pre-school-age children, but did not enforce that policy against men. The Supreme Court held that the "Court of Appeals ... erred in reading [Title VII] as permitting one hiring policy for women and another for men—each having pre-school-age children." *Id.* at 544, 91 S.Ct. at 498. The Court thus created a cause of action for "gender-plus" discrimination; that is, Title VII not only forbids discrimination against women in general, but also discrimination against subclasses of women, such as women with

pre-school-age children. *See, e.g., King v. Trans World Airlines,* 738 F.2d 255 (8th Cir.1984) (alleging gender-plus-child care discrimination); *Inda v. United Air Lines,* 565 F.2d 554 (9th Cir.1977) (alleging gender-plus-marriage discrimination), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978); *Sprogis v. United Air Lines,* 444 F.2d 1194 (7th Cir.) (same), *cert. denied,* 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971).

*Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1202 04 (10th Cir. 1997).

Defendant asserts that Plaintiff's comment during her deposition, answering affirmatively to a statement that Brown did not discriminate against all women, just foreign-born women, precludes her sex claim.  Docket #30 at 12.  Plaintiff responds that her case is one based on "intersectional discrimination," – "defined as a situation where the defendant treated the plaintiff disparately because she belonged simultaneously to two or more protected classes."  Docket #33 at 16 (citing *Harrington v. Cleburne Cty. Bd. of Educ.*, 251 F.3d 935, 937 (11th Cir. 2001), among others in circuits other than the Tenth).  However, as discussed above, the Court finds that Plaintiff has not shown she has been discriminated against on the basis of national origin, race, or color, and being "foreign born" is not a protected class under Title VII.  *See Espinoza v. Farah Mg. Co.*, 414 U.S. 86, 95 (1973) ("[N]othing in the Act makes it illegal to discriminate on the basis of citizenship or alienage.").  Thus, Plaintiff has not shown she has been discriminated against because of a combination of protected classes, so her intersectional discrimination theory fails.  However, the Court finds that Plaintiff makes a claim of gender-plus discrimination, as a more thorough reading of her deposition reveals.

Q.    So do you feel that Mr. Brown discriminates against you as a woman?
A.    Yes.
Q.    Do you think he has issues with women?
A.    Yes.
Q.    What do you think his issues are?
A.    I feel as though that if he did the things that he does to women, you know, especially a woman of – not the American woman, like her – me and her are different

20

– I'm from Africa. She's American. He does to women what he does to women because they don't speak the English. They don't know what their rights are. They don't know how to defend themselves. And he – I think he feels some sort of weakness from them, because, you know, the language being hard and – because he don't [*sic*] do that to men. You don't ever see Mr. Brown getting in a man's face. Because if he did that, we'd all say that's his personality, and that's who he is.

Q.      So he doesn't discriminate against all women, just foreign-born women?

A.      Correct.

Q.      Okay. And do you think he discriminates against Somalis in particular?

A.      I want to answer this as honestly as possible. I cannot answer about all Somalis, but the fact that I'm Somalian, the fact that other women who work there were Somalians, and the fact that, you know, he didn't only do that to Somali foreign women. He also did it to Hawaiian, Russian, Nigerian. So to me, where I look at [it] is, he does this to a woman who doesn't speak English, is limited in speaking the language, and – not Americans. That's how I looked at it. But I cannot say he nitpicked Somalis.

Q.      But Hawaiians are Americans, right?

A.      She says she's from – she doesn't speak English. I speak a little bit better English than she does. So she's from some sort of an island in Hawaii.

Plaintiff Dep. at 122:0-123:21.

Plaintiff thus expressed that the discrimination was based on her gender plus her not speaking English well, and that Brown took advantage of that combination to create a hostile work environment. Plaintiff's sworn deposition provided evidence that she experienced an environment in which a reasonable jury could find that Brown did just that: took advantage of her poor English skills and her gender, yelling and cursing at her regularly. Plaintiff states that she was intimidated to file complaints, but she told Schulthies, "not once, not 10 times, maybe over like 50 times" that she had been "discriminated against" and "harassed," and Defendant apparently concurred, suspending Brown as a result. Others affirmed Plaintiff's characterization of the workplace environment, such as employee Amina Wako, whose sworn declaration said that Brown yelled at female employees, but not at male, and that Brown tried to "intimidate" her. Employee V. Borulko's sworn affidavit said Brown yelled at her, and treated her with disrespect. She, too, said Brown

yelled at female employees but not at male, and that he yelled at the foreign-born women "very frequently, usually on a daily basis."  Employee Henry Mitchell "often over the years since at least 2008, and at least through 2013" saw and heard Brown yelling at Plaintiff "in a very abusive manner" about "once a week to about once every other week over those years," and he said that Brown yelled at other women during that same time period. Similarly, Hert, the Union steward, "frequently" witnessed Brown yelling at Plaintiff, and he "yelled at other female employees as well" with an "aggressive and abusive attitude and demeanor toward female employees that was not evident in his interactions with male employees."  Hert also indicated Brown had issues with foreign-born women and was "frequently in disputes with these women."  Nixon, the other Union steward, concurred that Brown yelled at Plaintiff, in her estimation "once a week," and that Brown yelled at other women, but not men, from 2009 to 2013 during Nixon's time there.

The facts also show that Brown's treatment of Plaintiff escalated into physical altercations on three occasions and to a verbal altercation in which Brown called Plaintiff "a little bitch" and told her to "go do your fucking job," although the parties – and witnesses – disagree on what happened and how egregious the actions were.  Plaintiff also may have faced disparate treatment by Brown's handling of her schedule and job opportunities, which is disputed.  Plaintiff elevated these concerns to Defendant's mid- and upper-level managers over the years, mostly to no avail, although Defendant did suspend Brown at one point.  As a result, a reasonable jury could find Plaintiff experienced depression, had to take off work, and otherwise suffered damages compensable under Title VII.

The Court notes that Defendant provided sworn declarations for several of the people for whom Plaintiff provided sworn affidavits – most times with conflicting statements.  Defendant also

submitted statements from foreign-born women who said they have not experienced poor treatment from Brown and from men who said Brown yelled at everyone, not just women and not just foreign-born women. However, the Court concludes that these issues merely show the need for a jury to weigh credibility and determine the truth. *See Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1175 (10th Cir. 2001) (the court "may not make credibility determinations or weigh the evidence" and "must disregard all evidence favorable to the moving party that the jury is not required to believe") (internal cites omitted).

Thus, the Court finds that Plaintiff's claim for hostile work environment based on sex should be heard by a jury, because under the totality of the circumstances, "a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis*, 142 F.3d at 1341.

## II.    Retaliation

The elements necessary to establish a prima facie case for a retaliation claim under Title VII are (1) the plaintiff engaged in protected opposition under Title VII, (2) a reasonable employee would have found the challenged action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Burlington*, 548 U.S. at 67-68. The second prong requires material adversity "because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace." *Id.* at 68  (internal quotations and citations omitted). Rather, the intent of the Title VII prohibition against retaliation is to disallow actions of employers that are likely to deter victims from reporting discrimination to their employers, the EEOC, and the courts. *Id.* at 69. The

fact that an employee continues to be undeterred in pursuit of a remedy may shed light on whether the actions were sufficiently material and adverse to be actionable. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1214 (10th Cir. 2008).

Defendant argues Plaintiff's retaliation claim must be dismissed because the retaliatory acts she alleges are not actionable in that she cannot show a decision-maker's actual knowledge of the Plaintiff's protected activity and, furthermore, she cannot demonstrate any resulting actions were adverse. Docket #30 at 17. Plaintiff responds that the retaliation claim stems from the second EEOC charge, which shows knowledge of the decision maker – who would have known about the first EEOC charge – and argues that the actions taken against Plaintiff were indeed adverse.

Because Plaintiff's counsel did not submit an affidavit providing the Court with sworn details about the nature of the alleged retaliatory acts, and because neither party submitted Plaintiff's full deposition transcript, which may have included more details, the Court is left to garner facts about the purported retaliation only from the second EEOC charge itself. On its own, that document does not provide information to indicate that the actions were adverse. There is no who, what, when, where and why to the allegations. Merely stating in a conclusory manner that Plaintiff was retaliated against in that she was assigned to physically demanding positions, placed on premature medical leave, assigned to undesirable shifts and positions, and transferred to a different position is simply not enough specificity to show adverse actions – those that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination" per *Burlington*.

Thus, the Court dismisses Plaintiff's retaliation claim.

### III.    Back Pay

Defendant argues Plaintiff is not entitled to back pay as she continues to work at Defendant's bakery and was never discharged, constructively or otherwise.  Docket #30 at 20.  Plaintiff asserts that the cases that stand for that proposition involve employees who were found to have resigned and were therefore not constructively discharged; however, those plaintiffs did not argue that they should have received back pay "as a result of being forced to take time off work due to the hostile work environment created by Defendant."  Docket #33 at 25.

"[T]he Tenth Circuit has long held that back is not available absent a showing of constructive discharge."  *Mallinson-Montague v. Pocrnick*, 224 F.3d 1224, 1236 (10th Cir. 2000) (citing *Deer v. Gulf Oil Corp.*, 796 F.2d 340, 342 (10th Cir. 1986).  As the Third Circuit made clear, loss of pay is not an issue unless the hostile work environment rises to the level where an employee is forced to abandon the job.  *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 (3d Cir. 2006).  Similarly, the Seventh Circuit noted that for a plaintiff to receive lost pay, he must establish a discriminatory discharge.  *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 660 (7th Cir. 2001), *cert. denied*, 534 U.S. 1130 (2002).  In essence, a plaintiff in such circumstances has a duty to mitigate his damages by staying on the job in the face of a hostile work environment pending resolution of his claims.  *See Pa. State Police v. Suders*, 542 U.S. 129 (2004).

While Plaintiff presents a novel argument that a *retained* employee who lost pay because of a hostile work environment should be eligible for back pay, she cites no law to support the proposition, and the Court's research leaves it unpersuaded.  Thus, the Court dismisses Plaintiff's claim for back pay, while noting that a jury may still award her compensatory damages and may consider her use of FMLA leave, allegedly because of stress, in determining such damages.

**CONCLUSION**

Accordingly, Defendant's Motion for Summary Judgment [filed November 4, 2015; docket #30] is **granted in part** and **denied in part**.  The Court **grants** Defendant's Motion by dismissing Plaintiff's (1) first claim, hostile work environment and discrimination on the basis of national origin, race, and color; (2) third claim (retaliation); and (3) request for back pay.  However, the Court **denies** Defendant's Motion as it relates to Plaintiff's second claim (hostile work environment and discrimination on the basis of sex) and will allow that claim to proceed to a jury.

Entered and dated at Denver, Colorado, this 15th day of January, 2016.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge